OPINION OF THE COURT
Fuchsberg, J.
 Applying an objectively stanced reasonable person standard, in the facts and circumstances of this case we hold that it could be found that written notification of the occurrence of an accident approximately seven and a half months after the assured learned of the event met a liability policy’s requirement that the insurer be given notice "as soon as practicable”. On a subsidiary issue, we also hold that the insurer is not liable for attorneys’ fees and disbursements necessarily incurred in the policyholder’s successful prosecution of the action it brought to compel the insurer to comply with its policy obligations.
Plaintiff, Mighty Midgets, Inc., is a nonprofit corporation organized to encourage, manage and otherwise lend support to boys’ football teams in Orangetown, Rockland County. On this appeal, its liability carrier, Centennial Insurance Company, challenges so much of an order of the Appellate Division as affirmed a judgment declaring that Centennial was required to defend and, within the limits of the applicable coverage, indemnify the Midgets against liability asserted in a suit arising out of an occurrence in which nine-year-old Glenn De Temple suffered serious personal injuries. The Midgets cross-appeal from so much of the order as deleted an award to cover its attorneys’ fees and expenses in the present litigation.
The accident to Glenn, then a member of a Midgets-sponsored team, took place on October 18, 1970, when, immediately after the completion of a game in which he had partici *17 pated, a large pot of boiling water which rested on the counter of an improvised frankfurter stand the Midgets operated as a fund-raising activity was caused to pour over him. Robert Halle, the unpaid volunteer president of the Midgets, was not present. But, learning of the misadventure before the day was out, he was the one who thereafter acted for his organization in a sequence of communications which, as found by the Trial Judge and later affirmed by the Appellate Division, provide the factual backdrop for the central legal issues confronting us today.
The first communication took the form of a telephone call to the Dunn & Fowler Division of Frank B. Hall & Company (Dunn), to whom Halle gave oral notice of the event and made inquiry as to the procedure to be followed in presenting a claim. It was no accident that it was Dunn that Halle called. Both the Centennial liability policy and a second one providing accident and health protection with the Hartford Accident & Indemnity Company had been secured for the Midgets at the instance of Dunn, a leading specialist in athletic team insurance and apparently the organization upon which the more than 2,500 teams enrolled in the national program of which the Midgets were a part would rely for guidance in insurance matters. Dunn’s role went far beyond that of solicitor of the liability policy. It collected the premiums, issued the policy and was designated by the policy as "agent or broker”. Moreover, this disjunctive phraseology was not at odds with the modus operandi Dunn and Centennial had in fact adopted. Their established practice was for Dunn, who wrote most if not all its athletic team business with Centennial, to be entrusted with large batches of policies executed by Centennial’s authorized signatories in blank, leaving it to Dunn rather than Centennial to fill in such things as policy numbers, names of assureds it procured and the premiums to be charged. When Dunn was ready to do so, it required no further authorization from Centennial to decide, as indeed it did in the case of the Midgets, if and when a policy was to go into effect.
Returning to Halle’s initial telephone call, his testimony, fully credited by the courts below, is that, upon identifying himself, describing the De Temple incident and asking whether he should "put it under a medical or [a] liability claim”, the Dunn representative to whom he reported instructed him the appropriate one was under the Hartford *18 accident and health policy. There was not the slightest suggestion that notice to Centennial would also be in order. The result was that the 21-year-old Halle, whose limited personal and vocational backgrounds were totally alien to either the world of insurance or that of the law, and who, as Dunn and Centennial presumably would know, until then had no previous experience in the processing of a liability claim, filed a claim only on a Hartford form supplied him by Dunn.
Thereafter, so far as the Midgets knew, things proceeded uneventfully until April 7, 1971, when Hartford for the first time notified the Midgets that its policy did not cover the accident because it had transpired after the game in which Glenn had participated was over. In the intervening months, Glenn’s father, an avid supporter of the Midgets, had never indicated the slightest intention of pursuing any claim other than the one filed against the Hartford. Nor does that possibility appear to have ever entered Halle’s mind. But Hartford’s refusal to pay the medical claim apparently roused the De Temples from their quiescence sufficiently for them to consult counsel, who, on May 25, sent a letter informing the Midgets that a liability suit on behalf of their clients was in the offing. Still reflecting his belief that communicating with Dunn was the same as communicating with Centennial, Halle forwarded this letter to Centennial care of Dunn and reminded this insurer that the facts of the accident had been reported previously, an obvious reference to his original telephone call.[1] This was the Midgets’ first written notice to Centennial.[2]
It was on this record that Trial Term, sitting without a jury, found as fact (1) that Dunn’s handling of the communications from Halle was negligent;[3] (2) that, "under the circumstances”, including Halle’s "limited * * * understanding of *19 insurance matters” and the relationship between Dunn and Centennial, the Midgets acted reasonably in that they did all that they "could do” until the arrival of the letter on May 25 first disabused them of the misinformation Dunn had imparted; and (3) that the letter transmitting the De Temple lawyer’s liability claim letter constituted written notice given "as soon as practicable” after the claim was made. Though the subsequent affirmance by the Appellate Division was by a vote of three to two, there was no division among its members either over the operative facts or over the deletion of the award for fees and expenses. However, the dissenters would have held the Midgets’ written notice untimely. For the reasons which follow, we, in turn, now affirm.
At the outset, we draw attention to the two provisions of the Centennial policy about which the controversy revolves. One tells us that, in the event of an occurrence resulting in personal injury or property damage, "written notice * * * shall be given by or for the INSURED to the company or any of its authorized agents as soon as practicable”. The other reads: "Notice to any agent * * * shall not effect a waiver or a change in any part of this policy or estop the company from asserting any right under the terms of this policy; nor shall the terms of this policy be waived or changed, except by endorsement issued to form a part of this policy, signed by a duly authorized representative of the company”.
It is well settled that the phrase "as soon as practicable” is an elastic one, not to be defined in a vacuum. By no means does it connote an ironbound requirement that notice be "immediate” or even "prompt”, relative as even those concepts often are; "soon”, a term close to each of these in common parlance, is expressly qualified in the policy here by the word "practicable”. Nor was compliance with the insurance policy’s temporal requirement to be measured simply by how long it was before written notification came forth. More crucial was the reason it took the time it did. So, the provision that notice be given "as soon as practicable” called for a determination of what was within a reasonable time in the light of the facts and circumstances of the case at hand. (Deso v London & Lancashire Ind. Co. of Amer., 3 NY2d 127, 129; State Farm Mut. Auto. Ins. Co. v Bush, 46 AD2d 958.)
Of course, there is no inflexible test of reasonableness. As with most questions whose, answers are heavily dependent on the factual contexts in which they arise, rules of general *20 application are hard to come by (see, e.g., Chinn v Butchers’ Mut. Cas. Co. of N. Y., 190 Misc 117 [failure to foresee that an insurance claim would eventuate]; Melcher v Ocean Acc. & Guar. Corp., 226 NY 51 [failure to foresee that an insurance claim would eventuate]; Padavan v Clemente, 43 AD2d 729 [justifiable lack of knowledge of insurance coverage]). Most pertinent to the case now before us, the conduct and representations of Centennial or its agent may be considered in determining whether notice has been unduly delayed (National Union Fire Ins. Co. v Hall, 233 Ky 337; General Fin. Co. v Pennsylvania Threshermen & Farmers’ Mut. Cas. Ins. Co., 348 Pa 358; 8 Appleman, Insurance Law & Practice, § 4741; 14 Couch, Insurance 2d, § 49:428).
Measured by these criteria, the contention that the Midgets’ delay in providing written notice was unreasonable as a matter of law is untenable. True, approximately seven and a half months elapsed between the date of the accident and the time when Halle, via Dunn, now found to have been Centennial’s agent for the receipt of written notice of claim (cf. Insurance Law, § 167, subd 1, par [c]), concededly delivered such notice. But, the Trial Judge found that the reason for so long a passage of time was the Midgets’ genuine, if misguided, belief that all the insurance notice necessary to protect the Midgets’ interests under any policies it carried for the De Temple accident had been furnished. There is nothing to indicate that it had a motive for not complying or that it did not stand ready to provide any information in any form that was required.
These factors could be weighed in the balance in determining whether the eventual written notice was given "as soon as practicable”. The dealings between Dunn and the Midgets could bear directly on that issue. Specifically, to that end the conduct of Dunn on the occasion of the original telephone call and thereafter, though ineffectual to legitimatize the oral notice given in the first instance, was relevant and material insofar as it affected the time the Midgets took before meeting the mandate for written notice.
Is the unsophisticated Halle then to be deemed not to have acted "as soon as practicable” as a matter of law because, on his initial experience in the reporting of an accident under the liability policy, he sought direction from Dunn, which had sold the Midgets both policies? To the contrary, even absent the close relationship which the undisputed evidence shows Cen *21 tennial and Dunn enjoyed, the former, as an insurer, can hardly have failed to appreciate how common it is for policyholders to rely almost exclusively on the advice of intermediaries, be they agents or brokers (cf. Drennan v Sun Ind. Co., 271 NY 182; Quinlan v Providence Washington Ins. Co., 133 NY 356).
Nor did Halle necessarily have to abandon his reliance on the correctness of Dunn’s original advice when, in April, he learned that Hartford had taken the position that its health and accident coverage did not apply. Notification that Hartford was denying coverage did not have to dissipate Halle’s erroneous belief that Centennial never was in the picture. It could be found, as the Trial Judge did, that, once the sense of security into which Halle had been lulled by Dunn’s and Centennial’s continued silence was dispelled by the receipt of the De Temple claim letter, he acted posthaste in forwarding it to Centennial’s agent.
In sum, under these circumstances there was enough evidence from which it could be found that the Midgets’ failure to notify the insurer before it did was not unreasonable and that, consequently, Centennial was not entitled to disclaim. Since our review is limited to determining whether the conclusion of the fact-finding courts finds support in the evidence, we must uphold their determination (Estate of Canale v Binghamton Amusement Co., 37 NY2d 875).
The Appellate Division was also correct in modifying the judgment of Trial Term by striking the award to the Midgets for the expenses to which it was put in bringing this action. It is the rule in New York that such a recovery may not be had in an affirmative action brought by an assured to settle its rights (Doyle v Allstate Ins. Co., 1 NY2d 439; Grimsey v Lawyers Tit. Ins. Corp., 31 NY2d 953), but only when he has been cast in a defensive posture by the legal steps an insurer takes in an effort to free itself from its policy obligations (see Johnson v General Mut. Ins. Co., 24 NY2d 42; Glens Falls Ins. Co. v United States Fire Ins. Co., 41 AD2d 869, affd on opn below 34 NY2d 778). Essentially, the latter cases find support in the theory that an insurer’s responsibility to defend reaches the defense of any actions arising out of the occurrence.
In contrast with other legal systems, such as that in Great Britain, it has now long been the universal rule in this country not to allow a litigant to recover damages for the amounts expended in the successful prosecution or defense of *22 its rights (see, generally, Alyeska Pipeline Co. v Wilderness Soc., 421 US 240, 247-259; Fleischmann Corp. v Maier Brewing Co., 386 US 714, 716-717; Goodhart, Costs, 38 Yale LJ 849, 873-874). Though not exempt from criticism (see Ehrenzweig, Reimbursement of Counsel Fees and the Great Society, 54 Cal L Rev 792), this practice reflects a fundamental legislative policy decision that, save for particular exceptions (see, e.g., CPLR 8303) or when parties have entered into a special agreement (Tyng v American Sur. Co., 174 NY 166), it is undesirable to discourage submission of grievances to judicial determination and that, in providing freer and more equal access to the courts, the present system promotes democratic and libertarian principles (see McCormick, Counsel Fees and Other Expenses of Litigation as an Element of Damages, 15 Minn L Rev 619, 641). There is nothing in the nature of this suit for declaratory judgment that should cause us to add to the exceptions to this now ingrained policy. Thus, unlike the circumstances presented when an insurer compels its assured to defend against its attempts to obtain a declaration of its right to disclaim, here it is the insured itself that has taken the offensive. Furthermore, it is not inherently unfair to disallow recovery for litigation fees to a prevailing party when these would not be assessed against an unsuccessful one.
For all these reasons, the order of the Appellate Division should be affirmed, but without costs.

. Though Dunn received copies of the documents and correspondence exchanged between the senior De Temple and Hartford and, eventually, of the latter’s rejection of the claim, it did not advise the Midgets of these developments.

. Because of the grounds on which we decide this case, it becomes unnecessary to describe subsequent events, although we note that Centennial’s own delay in disclaiming coverage was an alternate ground on which Trial Term premised the insurer’s obligation to defend and indemnify the Midgets.

. A separate suit, brought by the Midgets against Dunn .to recover damages for the latter’s negligence was consolidated with the declaratory action and the two cases tried together on the same evidence; having decided that Dunn was negligent, the trial court, to avoid duplication, ordered the assessment of damages held in abeyance until after the declaratory and personal injury suits will have been concluded. The personal injury suit has been awaiting the outcome .of the one before us now.